UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DENVEY EBANKS** | **CIVIL ACTION** |
| **VERSUS** | **NO:    08-1340** |
| **OFFSHORE LIFTBOATS, L.L.C.** <br> **AND C&E BOAT RENTAL, L.L.C.** | **SECTION "C" (1)** |

**ORDER AND REASONS**[1]

This matter comes before the Court on motion for summary judgment filed by third-party defendant Gulf Offshore Logistics, LLC ("GOL"), seeking defense and indemnity from Nippon Oil Exploration U.S.A., Limited. ("Nippon"). Having considered the record, the memoranda of counsel and the law, the Court has determined that the motion filed by GOL is DENIED for the following reasons.

I. BACKGROUND

Nippon, a company engaged in oil and gas exploration, retained GOL, a boat broker, through a Master Service Contract ("Nippon/GOL MSC") that was executed on June 22, 2005,[2] under which GOL would provide adequate equipment and personnel in connection with Nippon's oil and gas activities upon receiving work orders from Nippon. Rec. Doc. 75, Exh. A. Thereafter, GOL and Nippon entered into a time charter on September 1, 2006 ("2006 Time Charter") for the chartering of the L/B JANIE, and on May 3, 2007 the parties executed a nearly

---

[1] Chun-Ying Wu, a third-year student of Tulane University Law School, assisted in preparing this Order and Reasons.

[2] The contract was dated June 22, 2005, and GOL signed it on that day. Nippon executed the contract on June 27, 2005. Rec. Doc. 75, Exh. A.

identical copy of the time charter ("2007 Time Charter"). *Id.*[3][4] GOL chartered the M/V BETTY CHERAMIE from C&E Boat Rentals, LLC ("C&E") pursuant to a time charter signed on March 30, 2004 ("GOL/C&E Time Charter"). *Id.* at 2-3. Both the L/B JANIE and the M/V BETTY CHERAMIE were chartered to GOL in connection with Nippon's oil and gas production activities. *Id.*

The undisputed facts indicate that on December 17, 2007, Denvey Ebanks ("Ebanks"), an employee of Island Operating Company, Inc. ("IOC"), was assigned to work on a manned fixed platform, South Marsh Island 23-G ("SMI-23-G"), and its satellite platforms, including South Marsh Island 34I ("SMI-34I"). These fixed platforms were owned by Nippon and located in federal waters on the Outer Continental Shelf adjacent to the coast of Louisiana. IOC provided operating services to Nippon under a master service contract executed on July 28, 1998 ("Nippon/IOC MSC"). Rec. Doc. 75, Exh. D. Ebanks was injured during a vessel-to-vessel personnel transfer from the M/V BETTY CHERAMIE to the L/B JANIE, which were owned and operated by Offshore Liftboats and C&E, respectively. *Id.* At the time of the accident, the L/B JANIE, which had a crane and boom fixed to it, was jacked-up next to SMI-34I.

On March 19, 2008, Ebanks filed suit against Offshore Liftboats and C&E for injuries sustained during the said personnel transfer. Rec. Doc. 1. On July 16, 2008, Offshore Liftboats

---

[3] The 2006 Time Charter provided by GOL is not signed by Nippon. Rec. Doc. 75, Exh. C. An identical version of the 2006 Time Charter provided by Nippon is signed by both parties. Rec. Doc. 77, Exh. 1. However, the title and the signature lines of the 2006 Time Charter indicate that the document is between GOL and Nippon, yet the introductory paragraph states that it's a contract between GOL and Offshore Liftboats, LLC ("Offshore Liftboats). Additionally, the first paragraph of the 2007 Time Charter indicates that it's a proposed contract between Offshore Liftboats and Nippon (represented by GOL), while Offshore Liftboats did not sign the document.

[4] Under the 2006 Time Charter the day rate for the charter of L/B JANIE is $29,400, and that the charterer agrees to pay $22 per meal, per person, per day and $22 lodging per person, per day. The 2007 Time Charter requires the same meal rate and lodging rate, but the day rate for the charter of L/B JANIE is $17,500 per day. The designated port is Fourchon, Louisiana under both time charters.

filed a third-party complaint against GOL based on the indemnity provision in their time charter agreement.[5] Rec. Doc. 12. On March 25, 2009, GOL brought third-party demands against Nippon and IOC, seeking indemnity for contractual liability to Offshore Liftboats. Rec. Doc. 50. Section 12(e) in the Nippon/GOL MSC provides:

> Company [Nippon] agrees to protect, defend, indemnify and hold harmless Contractor's [GOL's] Group from and against any and all Claims in respect of damage to or loss or destruction of property owned, rented or hired by any member of Company's [Nippon's] Group or for personal or bodily injury to, for illness, disease or death of, or for loss of services, wages, consortium or society by any such member, which are asserted by or arise in favor of any member of Company's [Nippon's] Group on account of any cause whatsoever (including, but not limited to, the sole, joint and/or concurrent negligence, fault or strict liability of any member of Contractor's [GOL's] Group.

Rec. Doc. 75, Exh. A. Section 12(c) further defines the term "Claims" as:

> [C]laims, demands, disputes, losses, damages, awards, liabilities, settlements, interests, penalties, fines, administrative and judicial proceedings and orders, judgments, and enforcement actions of any kind and nature, known or unknown, contingent or otherwise, and all costs and expenses incurred in connection therewith (including, without limitation, investigation and laboratory fees, court costs and litigation expenses), which in any way arise out of or are related to the performance of work under, or related to the subject matter of, this Contract.

*Id.*

GOL argues in this motion that the Nippon/GOL MSC clearly evidences the parties' intention to indemnify each other against third party contractual claims and that Nippon is obligated to defend and indemnify GOL for its obligations to defend and indemnify Offshore Liftboats. GOL contends that the Nippon/GOL MSC, which provides that it "shall control and govern all work performed by [GOL] for [Nippon] under oral or written work or purchase orders,"

---

[5] It is undisputed that on May 18, 2009, GOL accepted Offshore Liftboats's tender demanding defense and indemnity.

governs the chartering of L/B JANIE because the chartering was made pursuant to a work order from Nippon. GOL offers a Work Order Confirmation produced from its logging system, related invoices from GOL and Offshore Liftboats, and a copy of a check from Nippon's subsidiary. Rec. Doc. 85, Exh. L. However, the Work Order Confirmation does not bear a signature of Nippon's representative.[6] GOL further maintains that pursuant to the "Conflict of Provisions" section in the Nippon/GOL MSC,[7] the indemnity provisions in the Nippon/GOL MSC prevail over those in the 2006 Time Charter.

Based on the foregoing argument, GOL contends that the phrase "on account of any cause whatsoever" in Section 12(e) and the broad definition of "Claims" under Section 12(c) clearly evidence the parties' intention of providing for indemnity against contractual liability. GOL also notes that Section 12(m)[8] explicitly includes contract liability within the scope of indemnity obligation. In addition, GOL argues that the inclusion of GOL's subcontractors in the

---

[6] The Work Order Confirmation confirms that the work order (i) was dated May 16, 2007; (ii) had a duration of 246 days; (iii) provided a day rate of $17,500 for the charter of L/B JANIE; (iv) provided the meal rate at $22 per person, per day and the lodging rate at $22 per person, per day; and (v) provided that the vessel to be made available and re-delivered at Fourchon, Louisiana. Rec. Doc. 85, Exh. L.

[7] Section 18 of the Nippon/GOL MSC provides:
> In the event there should be any conflict or inconsistency between the provisions of this contract and any purchase order, field work order, Contractor's [GOL's] work ticket, invoice, statement, published rate schedule or any other type of memoranda, whether written or oral, between Company [Nippon] and Contractor [GOL], the provision of this Contract shall control.

Rec. Doc. 75, Exh. A.

[8] Section 12(m) of the Nippon/GOL MSC provides:
> The exclusions of liability and mutual releases and mutual indemnities set forth in this Section 12 shall apply to any Claim or Claims without regard to the cause or causes thereof including, but not limited to, Claims caused by, resulting from, arising out of or incidental to pre-existing conditions, . . . tort, *breach of contract*, breach of statutory duty, . . . , or the negligence of any person (including the indemnified individual or entity), whether such negligence be sole, joint and/or concurrent, active or passive, or such Claim is based on any other theory of legal liability. (*emphasis added*)

Rec. Doc. 75, Exh. A.

definition of "Contractor's Group" in Section 12 obligates Nippon to indemnify GOL against the contractual claim brought by Offshore Liftboats.[9]

Nippon asserts in opposition that neither the Nippon/GOL MSC nor the 2006 Time Charter provides a right to indemnity for contractual liability. It is the 2006 Time Charter, Nippon argues, that controls the chartering of L/B JANIE because the time charter is a subsequent specific contract replacing the Nippon/GOL MSC. The indemnity section in the 2006 Time Charter provides:

> CHARTERER [Nippon] releases OWNER [GOL] from any liability to CHARTERER [Nippon] for, and CHARTERER [Nippon] will defend, indemnify and hold OWNER [GOL], its co-ventures, co-operators, partners, and the officers, shareholders, directors, employees, agents, and representatives of any of them, harmless from and against all suits, actions, claims, and damages based upon personal injury, death, property damage, or loss, whenever occurring, suffered or incurred by CHARTERER [Nippon], its other contractors and sub-contractors, its customers, and its customers' other contractors and sub-contractors, and the officers, employees, invitees, agents and representatives of any of them, arising from or related in any way to the performance of the work hereunder, regardless of how such personal injury death, property damage, or loss is caused, and even if caused y the unseaworthiness, of any vessel, or the negligence, whether sole or concurrent, or active or passive, or other legal fault of OWNER [GOL], including strict liability of OWNER [GOL], its co-ventures, co-operators, partners, and the officers, shareholders, directors, employees, agents, and representatives of any of them.

Rec. Doc. 77, Exh. 1. Nippon maintains that it is not liable for GOL's liabilities to Offshore Liftboats because the foregoing provision specifically limits the indemnity to "personal injury, death, property damage, or loss." Alternatively, Nippon contends that even if the Nippon/GOL

---

[9] Section 12(b) of the Nippon/GOL MSC provides:
Contractor's [GOL's] Group shall mean (i) Contractor [GOL], its parent, subsidiary, affiliated and interrelated corporations, companies and other entities; (ii) its and their . . . subcontractors and their respective parent, subsidiary, affiliated and interrelated corporations, companies and other entities; (iii) the officers, . . . employees, . . . , invitees, insurer and re-insurers of those individuals and entities identifies in (i) and (ii) . . .
Rec. Doc. 75, Exh. A.

MSC governs the chartering of L/B JANIE, it does not provide indemnity for contractual liability because the indemnity provisions do not give express notice of such obligation.

## II.  LAW AND ANALYSIS

### A.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All the facts and evidence must be taken in the light most favorable to the non-movant. *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir.2007). The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Once the burden of the movant is discharged, the burden shifts to the non-movant to show, by either referring to evidentiary material in the record or by submitting additional evidentiary documents, that genuine issues of material fact remain to be resolved. *Id.* For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. *Id.*

### B.  ANALYSIS

   1. *Whether Nippon is obligated to indemnify GOL against contractual liability either under the Nippon/GOL MSC or the 2006 Time Charter.*

Indemnity provisions in maritime contracts, "whether governed by federal maritime or Louisiana law, should be read as a whole and its words given their plain meaning unless the

6

provision is ambiguous." *Foreman v. Exxon Corp.*, 770 F.2d 490, 496 (5th Cir.1985). When a motion for summary judgment concerns the interpretation of a contract, courts will construe the contract as a matter of law "where the written instrument is so worded that it can be given a certain definite legal meaning or interpretation." *Breaux v. Halliburton Energy Serv., Inc.*, 562 F.3d 358, 364 (5th Cir. 2009).

It is settled law that although "[a] contract need not contain any special words to evince an intention to create a right of indemnity for independent contractual liabilities," it must unequivocally express such a purpose. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir.1981). When the intent to assume an obligation for indemnitee's contractual liability is evidenced, "[the] contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties." *Id.* at 333.

In *Corbitt v. Diamond M. Drilling Co.*, the United State Court of Appeals for the Fifth Circuit held that contractual language creating an indemnity obligation "for injury to or death or illness of persons" gave express notice only of claims based on tortious injuries but not contractual claims. *Corbitt*, 654 F.2d at 333-34. In that case Shell Oil contracted with Diamond M. and Sladco to work on a drilling operation. *Id.* at 331. Corbitt, an employee of Sladco, sued Diamond M. in tort, Diamond M. then sought indemnification from Shell pursuant to their contract. *Id.* Shell subsequently filed a third-party action seeking indemnification from Sladco pursuant to their contract, which provided that "[Sladco] shall indemnify and defend [Shell] . . . against all claims, suits, liabilities and expenses on account of injury or death of . . . employees of Shell or [Sladco] . . . arising out of or in connection with performance of this [contract]." *Id.*

7

The Fifth Circuit held that Shell was not entitled to indemnification from its contractor, Sladco, because the indemnification provision in the Shell/Sladco contract restricted Sladco's duty to indemnify solely to tortious obligations. *Id.* at 333. The Fifth Circuit refused to read the phrase "all claims" to include contractual obligations because the Shell/Sladco contract did not specifically provide that Sladco assumed claims arising from Shell's own separate contractual obligations. *Id.*; *see also Foreman*, 770 F.2d at 497-98 (holding that a service contract that provides indemnity "against all claims, demands and causes of action ... for injury to or death or illness of persons" does not obligate a contractor to indemnify an oil company against a claim brought by a rig company because the indemnity provision, without naming the rig company as an indemnitee, merely includes tortious obligations).

In contrast, the Fifth Circuit in *Sumrall v. Ensco Offshore Co.* held that an indemnitor had notice of contractual liabilities where a contract provided indemnity "from and against all claims, losses, costs, demands, damages, suits, ... and causes of action of whatsoever nature or character ... and whether arising out of contract, tort, strict liability, . . . and/or any cause whatsoever." 291 F.3d 316, 318 (5th Cir.2002). There, Sumrall was an employee of Premiere, an offshore drilling service provider. *Id.* at 317. Sumrall sued Ensco, the owner of a jack-up vessel, to recover for injuries sustained while working on the vessel. *Id.* Santa Fe, a rig operator, assumed defense of claim pursuant to its contract with Ensco and then sought indemnification from Premiere. *Id.* at 317-18. The Fifth Circuit reasoned that, unlike the narrowly drawn language in *Corbitt*, indemnity provisions in the contract between Santa Fe and Premiere, contained rather expansive language broadening Santa Fe's right to indemnification for "all claims ... of whatsoever nature or character . . . whether or not caused by the . . . legal duty of

8

[Santa Fe]." *Id.* at 320. It also stressed that the contract specifically provided indemnity against liability arising out of contract. *Id.*

Moreover, in *Lirette v. Popich Brothers Water Transportation, Inc.*, the Fifth Circuit held that where a contract included a third party as an indemnitee, it gave the indemnitor express notice of indemnity for third party contractual liability. 699 F.2d 725, 728 (5th Cir.1983). In that case, Popich owned and operated a vessel time-chartered to a boat broker, Candies. *Id.* at 726. The contract between Popich and Candies required Popich to indemnify Candies and its affiliated companies against personal injury claims made by Popich employees. *Id.* at 726-27. Candies then time-chartered the vessel to Exxon for transportation between shore and drilling platforms. *Id.* at 726. The contract between Candies and Exxon required Candies to indemnify Exxon against personal injuries made by either Candies or Popich employees. *Id.* Lirette, a Popich employee, brought claims against Exxon and Candies seeking damages for injuries he sustained in an accident of the vessel. *Id.* at 726-27. Candies, being obligated to indemnify Exxon under the Candies/Exxon contract, sought reimbursement from Popich under the Candies/Popich contract. *Id.* at 727. Popich argued that the provision did not require it to indemnify Candies for its own contractual obligation to Exxon, which arose out of the separate agreement between Candies and Exxon. *Id.* at 727. The Fifth Circuit found that Popich owed an obligation directly to Exxon because Exxon was among the class of affiliated companies named in the indemnity provision. *Id.* at 728. It reasoned that when Candies merely acted as a "conduit" for indemnification, "the contractual obligation is operationally prescribed with no distinction being made between so-called contractual or so-called tortious liability." *Id.* at 728. Accordingly, the Fifth Circuit determined that Popich was obligated to indemnify Candies even though

Candies's obligation to Exxon was based on contract rather than on torts. *Id.* The Fifth Circuit subsequently applied *Lirette*'s conduit principle in several cases. *See Mills v. Zapata Drilling Co.*, 722 F.2d 1170,1175 (5th Cir.1983) (overruled on other grounds, *Kelly v. Lee's Old Fashioned Hamburgers, Inc.*, 908 F.2d 1218 (5th Cir.1990) (per curiam)); *Campbell v. Sonat Offshore Drilling, Inc.*, 27 F.3d 185, 187-88 (5th Cir.1994); *Sumrall*, 291 F.3d at 320; *St. Paul Surplus Lines Ins. v. Halliburton Energy Serv., Inc.*, 445 F.3d 820, 825 (5th Cir. 2006).

  Plain reading of the indemnity provisions in the agreements at bar shows that the indemnity obligation under the Nippon/GOL MSC and that under the 2006 Time Charter are not identical. The language of Section 12 in the Nippon/GOL MSC is closely similar to those of the indemnity provisions in *Sumrall* and *Lirette*. As the provision in *Sumrall* providing indemnity against "claims . . . of whatsoever nature or character," Section 12(e) requires the indemnitor to hold harmless "from and against any and all Claims . . . on account of any cause whatsoever." Moreover, like the indemnity provision in *Sumrall* which broadly included "all claims, losses, costs, demands, damages, suits . . ." within the indemnity obligation, here Section 12(c) defines "Claims" to include "claims, demands, . . ., liabilities . . . of any kind and nature . . . which in any way arise out of or are related to . . . this Contract." Admittedly, Section 12(e), as the contract in *Corbitt*, contains language that refers to property damage or personal injuries. Nevertheless, Section 12 is distinguishable from the indemnity provision in *Corbitt* in that Section 12 names "[GOL], its . . . affiliated and interrelated corporations . . . and . . . subcontractors" as indemnitees. Similar to the indemnity provisions in *Lirette*, in which the Fifth Circuit held that where an indemnity contract named third parties as indemnitees "the contractual obligation is operationally prescribed with no distinction being made between so-called contractual or so-

called tortious liability," Section 12 clearly lists third parties, including affiliated companies and subcontractors, as indemnitees. Because Offshore Liftboats is among the class of indemnitees named in the Nippon/GOL MSA, GOL is viewed as a conduit through which Nippon's indemnification is passed to Offshore Liftboats. As a result, this Court finds that the Nippon/GOL MSC obligates Nippon to indemnify GOL against Offshore Liftboats's contractual claim.

In contrast, the 2006 Time Charter is more similar to the contract in *Corbitt*. Like the indemnity provision in *Corbitt*, where the Fifth Circuit held that the language providing indemnity "against all claims, suits, liabilities and expenses on account of injury or death of persons" did not give express notice of contractual liability, the 2006 Time Charter obligates Nippon to indemnify GOL against "claims . . . damages based upon personal injury, death, property damage, or loss." Nowhere does the 2006 Time Charter mention contractual obligation. Furthermore, unlike the contracts in *Lirette* and its progeny, the 2006 Time Charter does not include subcontractors or other third parties in the class of indemnitees. Under the 2006 Time Charter Nippon only owes an obligation to "[GOL], its co-ventures, co-operators, partners, and the officers, shareholders, directors, employees, agents, and representatives of any of them." As a result, the Court finds that Nippon is not required to indemnify GOL against its contractual liability to Offshore Liftboats.

   2. *Which contract, the Nippon/GOL MSC or the 2006 Time Charter, controls the issue?*

The parties heavily dispute which indemnity provision should apply to the liability to Offshore Liftboats. GOL asserts that the Nippon /GOL MSC governs the matter here because the chartering was pursuant to a work order from Nippon. GOL offers the Work Order Confirmation,

its related invoices and a copy of a check as evidence. GOL maintains that since the Nippon/GOL MSC states that it "shall control and govern all work orders performed by [GOL] for [Nippon]," the Nippon/GOL MSC controls. However, Nippon raises questions about the veracity of the Work Order Confirmation and argues that the two companies' subsequent time charter was intended to control matters related to the chartering of L/B JANIE. Viewing the evidence most favorable to the nonmovant, we are not convinced that the Nippon/GOL MSC governs the issue at bar.

Under either federal maritime law or state law, "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous." *Corbitt*, 654 F.2d at 333-34; *see also Ortega v. State, Dept. of Transp. & Dev.*, 689 So.2d 1358, 1363-64 (La. 1997) (holding that under Louisiana contract law, parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous.). A master service agreement is a precursor of the contract parties' obligations that are to be perfected by the subsequent work orders, *Nesom v. Cheveron U.S.A., Inc.*, 633 F.Supp. 55, 60 (E.D. La 1984), and the parties may amend or supplement a master service agreement by subsequent work orders or contracts. *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 315 (5th Cir. 1990). Unless provided otherwise, "a contract containing a term inconsistent with a term of an earlier contract *between the same parties* is interpreted as including an agreement to rescind the inconsistent term in the earlier contract." *Breaux*, 562 F.3 at 366 (*citing* 29 Williston on Contracts § 73:17 (4th ed. 2003) (*emphasis original*).

Although GOL and Nippon entered into a master service contract, that fact alone does not preclude the parties from modifying or supplementing the contract. Moreover, the Nippon/GOL MSC clearly acknowledges that the parties may subsequently amend their obligations. The second paragraph of Section 1 in the Nippon/GOL MSC states that "[*u*]*nless the parties hereto specifically agree in writing otherwise*, [the Nippon/GOL MSC] shall control and govern all work orders performed by [GOL] for [Nippon]." (*emphasis added*)[10] Therefore, Nippon and GOL certainly are free to modify their obligation.

After the execution of the Nippon/GOL MSC, GOL and Nippon signed the two time charters for the chartering of L/B JANIE. Both the 2006 Time Charter and the 2007 Time Charter contain a term stating that the time charter "*shall govern the chartering of L/B JANIE* for the use and assistance in GOL's customers' activities in the Gulf of Mexico and adjacent navigable waters as specified, involving the exploration for production of oil, gas, and other minerals, or related transportation services . . ." (*emphasis added*) Given that the time charters were executed by the same parties after the Nippon/GOL MSC, that the time charters specifically addressed the chartering of L/B JANIE, and that the indemnity obligation is narrower under the time charters, it is reasonable to find that Nippon and GOL intended the time charters to amend the Nippon/GOL MSC with respect to the chartering of L/B JANIE.

However, a handful of inconsistencies and ambiguities in the documents obscure the parties' intention. First, the introductory paragraph in the 2006 Time Charter refers GOL as the charterer and Offshore Liftboats as the owner, but the signature line instead indicates GOL as the owner. Rec. Doc. 77, Exh. 1. Second, the title and the signature lines of the 2006 Time Charter

---

[10] Rec. Doc. 75-6 at 1.

state that the document is between GOL and Nippon, yet the introductory paragraph indicates that it's a contract between GOL and Offshore Liftboats. *Id.* Similar inconsistencies appears in the 2007 Time Charter, in which the first paragraph says it's a proposed contract between Offshore Liftboats and Nippon (represented by GOL), while Offshore Liftboats did not sign the document. Rec. Doc. 75, Exh. E. Third, the introductory paragraph states that the 2007 Time Charter is entered into on May 3, 2007, but the signature lines indicate that it is signed on August 30, 2006. *Id.* Fourth, the first paragraph of the GOL/C&E Time Charter refers to "the terms of the Blanket Time Charter Agreement dated June 27, 2005" between Nippon and GOL. Rec. Doc. 77, Exh. F. However, the term "Blanket Time Charter Agreement" appears only in the 2006 Time Charter and 2007 Time Charter, which apparently were not executed on June 27, 2005. Last, the Work Order Confirmation, even taken as true, does not indisputably prove that the work order was pursuant to the Nippon/GOL MSC because the terms in the work order were in conformity with those in the 2007 Time Charter.[11] The Court finds that these confusing inconsistencies regarding the validity of the disputed contracts are material and preclude summary judgment.

GOL's next contention is that the "Conflict of Provisions" section in the Nippon/GOL MSC compels the Court to read that the indemnity provisions in the master contract trump those of the time charters. This section provides that where there is a conflict or inconsistency between the terms of the Nippon/GOL MSC and "a purchase order, field work order, [GOL's] work ticket, invoice, statement, published rate schedule or any other type of memoranda, whether written or oral, between [Nippon] and [GOL]," the provisions of the Nippon/GOL MSC shall prevail.

---

[11] *See supra* note 4 and note 6.

*Supra* note 7, Rec. Doc. 75, Exh. A. Essentially, GOL is arguing that the 2006 Time Charter falls within the meaning of the term "work order."

To support its position, GOL cites *Chouest Offshore Service v. Superior Energy Service*, L.L.C., 2007 WL 325357 (E.D. La. 2007) (Barbier, J.). In *Chouest* the indemnity sections in the master contract covered only damages to persons or property of the indemnitee and its employees, agents or subcontractors, whereas the indemnity condition in the purchase order required an indemnification regardless of the identity of the claimant as long as the loss did not result from indemnitee's sole negligence. *Id.* at *1. Both the master contract and the purchase order contained a section providing that the master contract shall prevail when there was a conflict. *Id.* at *2. There was no dispute over whether the subsequent agreement was a purchase order, and the indemnitor merely argued that there was no conflict. *Id.* The court found that a conflict existed since the indemnity provision in the purchase order was broader than that of the master contract. *Id.* at *3. Accordingly, Judge Barbier held that the master contract controlled because both the master contract and the purchase order recognized that the master contract shall prevail in the event of a conflict. *Id.*

However, *Chouest* does not resolve the issue here. Unlike the parties in *Chouest* which both agreed that the subsequent agreement was a purchase order, here Nippon and GOL dispute whether the time charter is a distinct and specific agreement that replaces or amends the master contract. In addition, the otherwise ambiguous 2006 Time Charter does not have a term that confirms the superiority of the master contract as the purchase order in *Chouest* did. Furthermore, contrary to *Chouest* where the subsequent purchase order broadened the indemnity obligation, here the indemnity provisions in the 2006 Time Charter narrows down the indemnity obligation

under the Nippon/GOL MSC. Thus, Nippon falls short of convincing the Court that the time charter should be regarded as a work order under the Nippon/GOL MSC.

Accordingly,

IT IS ORDERED that the motion for summary judgment on defense and indemnity against Nippon Oil Explora[tion] U.S.A., Ltd. filed by Gulf Offshore Logistics, L.L.C. (Rec. Doc. 75) is DENIED.

New Orleans, Louisiana this 10th day of November, 2009.

HELEN G. BERRIGAN
UNITED STATE DISTRICT COURT