UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **DENVEY EBANKS** | **CIVIL ACTION** |
| **VERSUS** | **NO:08-1340** |
| **OFFSHORE LIFTBOATS, L.L.C.<br>AND C&E BOAT RENTAL, L.L.C.** | **SECTION "C" (1)** |

**ORDER AND REASONS**[1]

Comes before the Court on motion for summary judgment filed by third party defendant Island Operating Company, Inc. ("IOC"), requesting the Court to dismiss the third party claim brought by Gulf Offshore Logistics, LLC ("GOL") against IOC. Having considered the record, the memoranda of counsel and the law, the Court has determined that the motion filed by IOC is GRANTED for the following reasons.

**I. BACKGROUND**

The following facts are undisputed. IOC provided operating services to Nippon Oil Exploration U.S.A., Limited. ("Nippon"), a company engaged in oil and gas exploration, under a master service contract executed on July 28, 1998 ("Nippon/IOC MSC"). Rec. Doc. 88, Exh. A. On December 17, 2007, Denvey Ebanks ("Ebanks"), a lead production operator employed by IOC, was assigned to work on a manned fixed platform, South Marsh Island 23-G ("SMI-23-G"), and its satellite platforms, including South Marsh Island 34I ("SMI-34I"). These fixed platforms were owned by Nippon and located in federal waters on Outer

---

[1] Chun-Ying Wu, a third-year student of Tulane University Law School, assisted in preparing this Order and Reasons.

1

Continental Shelf ("OCS") adjacent to the coast of Louisiana. The main mode of transportation of Ebanks and his crew had been by helicopters. However, on December 17, 2007, a liftboat, the L/B JANIE, was jacked up next to SMI 34-I. Operating a helicopter was extremely dangerous because the L/B JANIE, which rested its legs on the seabed, had a crane and a boom permanently affixed to it. Thus, Ebanks and the crew were transported by a vessel, the M/V BETTY CHERAMIE. They were transferred from the M/V BETTY CHERAMIE to the L/B JANIE on a personnel basket lifted by the crane on the L/B JANIE. Once Ebanks was aboard the L/B JANIE he would walk to the platform through a walkway that had been erected between the platform and the liftboat. However, due to the alleged negligent operation of the crane, the personnel basket tilted and the bottom of the personnel basket hit the stacks of the M/V BATTY CHERAMIE. As a result of the impact, part of Ebanks's body was thrown out of the basket and contacted the stacks of the M/V BATTY CHERAMIE. Ebanks alleged that he sustained injuries due to the impact.

At the time of the accident, the L/B JANIE and the M/V BETTY CHERAMIE were owned and operated by Offshore Liftboats, LLC ("Offshore Liftboats") and C&E Boat Rentals, LLC ("C&E"), respectively. Both boats were time chartered to GOL, a boat broker, in connection with Nippon's oil and gas production activities. Nippon retained GOL through a Master Service Contract ("Nippon/GOL MSC") that was executed on June 22, 2005,[2] under which GOL would provide adequate equipment and personnel in connection with Nippon's oil and gas activities upon receiving Nippon's work orders. Rec. Doc. 75, Exh. A.

---

[2] The contract was dated June 22, 2005, and GOL signed it on that day. Nippon executed the contract on June 27, 2005. Rec. Doc. 75, Exh. A.

On March 19, 2008, Ebanks filed suit against Offshore Liftboats and C&E for injuries allegedly sustained during the said personnel transfer. Rec. Doc. 1. On July 16, 2008, Offshore Liftboats filed a third-party complaint against GOL based on the indemnity provision in their time charter agreement.[3] Rec. Doc. 12. On March 25, 2009, GOL brought third-party demands against IOC, seeking indemnity for contractual liability to Offshore Liftboats. Rec. Doc. 50. Section 12(d) in the Nippon/IOC MSC provides:

> Contractor [IOC] agrees to protect, defend, indemnify and hold harmless Company's [Nippon's] Group from and against any and all Claims in respect of damage to or loss or destruction of property owned, rented or hired by any member of Contractor's [IOC's] Group or for personal or bodily injury to, for illness, disease or death of, or for loss of services, wages, consortium or society by any such member, which are asserted by or arise in favor of any member of Contractor's [IOC's] Group on account of any cause whatsoever (including, but not limited to, the sole, joint and/or concurrent negligence, fault or strict liability of any member of Company's [Nippon's] Group).

Rec. Doc. 88, Exh. A. Company's [Nippon's] Group includes Nippon and its contractors. *Id.* Furthermore, Section 12(c) defines the term "Claims" as:

> [C]laims, demands, disputes, losses, damages, awards, liabilities, settlements, interests, ~~penalties, fines~~, administrative and judicial proceedings and orders, judgments, and enforcement actions of any kind and nature, known or unknown, contingent or otherwise, and all costs and expenses incurred in connection therewith (including, without limitation, investigation and laboratory fees, court costs and litigation expenses), which in any way arise out of or are related to the performance of work under, or related to the subject matter of, this Contract.

*Id.* (*deletions original*)

IOC moves to dismiss GOL's claim. First, IOC asserts that GOL is not entitled to indemnity under the Nippon/IOC MSC because GOL is not a contractor of Nippon. IOC

---

[3] It is undisputed that on May 18, 2009, GOL accepted Offshore Liftboats's tender demanding defense and indemnity.

claims that the term "contractor" should only include those retained by Nippon to work simultaneously with IOC's employees on the platforms. IOC also contends that at best the meaning of the term "contractor" is ambiguous. Pursuant to the rule of interpreting ambiguity against the drafter, IOC argues, the Court should read the contract in favor of IOC's reasonable interpretation and construe the meaning of "contractor" against GOL, a third party beneficiary. Second, IOC asserts that even if GOL is among the class of indemnitees under the Nippon/IOC MSC, the master contract does not provide for indemnity for GOL's contractual liabilities to Offshore Liftboats because the language of the indemnity provision only includes indemnity against tortious claims. Third, IOC contends that the indemnity provision should be invalidated under the Louisiana Oilfield Anti-Indemnity Act (LOIA) because the alleged injuries occurred on a situs covered by the Outer Continental Shelf Lands Act (OCSLA) and the Nippon/IOC MSC is non-maritime.

      GOL argues in opposition that IOC is obligated to indemnify GOL pursuant to the Nippon/IOC MSC. GOL argues that there is no ambiguity as to the meaning of the term "contractor" because the Nippon/GOL MSC confirms GOL's position as Nippon's contractor. GOL then argues that the Nippon/IOC MSC obligates IOC to indemnify GOL against contractual obligations because the indemnity language provides indemnity "against any and all Claims . . . which are asserted by or arise in favor of any member of [IOC's] Group on account of any cause whatsoever." Moreover, GOL contends that IOC has express notice of indemnity for contractual liability because the term "Claims" include "liabilities . . . of any kind and nature, known or unknown, contingent or otherwise, . . . which in any way arise out of or are related to the performance of work under, or related to the subject matter of, [the

Nippon/IOC MSC]." In response to IOC's argument that the LOIA invalidates the indemnity provision, GOL maintains that the accident did not occur on an OCSLA situs because Ebanks was injured when the personnel basket hit the stacks of the M/V CHERAMIE – a vessel that undisputedly is not an OCSLA situs. In addition, GOL argues that since transportation by a vessel was required on the date of the accident, the Nippon/IOC MSC is a maritime contract and therefore the LOIA does not apply.

## II. LAW AND ANALYSIS

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). All the facts and evidence must be taken in the light most favorable to the non-movant. *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 387 (5th Cir.2007). The party moving for summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Once the burden of the movant is discharged, the burden shifts to the non-movant to show, by either referring to evidentiary material in the record or by submitting additional evidentiary documents, that genuine issues of material fact remain to be resolved. *Id.* For any matter on which the non-movant would bear the burden of proof at trial, however, the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial. *Id.*

## B.  ANALYSIS

### 1. GOL Is A "Contractor" As Envisioned In The Nippon/IOC MSC And The Nippon/IOC MSC Contract Gives IOC Express Notice Of An Indemnity Obligation For Contractual Liability To Offshore Liftboats.

Indemnity provisions should be read as a whole and its words given their plain meaning unless the provision is ambiguous. *Foreman v. Exxon Corp.*, 770 F.2d 490, 496 (5th Cir.1985) (stating that federal maritime law and Louisiana law were not different with regard to interpreting indemnity provisions). When a motion for summary judgment concerns the interpretation of a contract, courts will construe the contract as a matter of law "where the written instrument is so worded that it can be given a certain definite legal meaning or interpretation." *Breaux v. Halliburton Energy Serv., Inc.*, 562 F.3d 358, 364 (5th Cir. 2009).

It is settled law that although "[a] contract need not contain any special words to evince an intention to create a right of indemnity for independent contractual liabilities," it must unequivocally express such a purpose. *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 333 (5th Cir.1981). When the intent to assume an obligation for indemnitee's contractual liability is evidenced, "[the] contract of indemnity should be construed to cover all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties." *Id.* at 333.

In *Corbitt*, the United State Court of Appeals for the Fifth Circuit held that contractual language creating an indemnity obligation "for injury to or death or illness of persons" gave express notice only of claims based on tortious injuries but not contractual claims. *Corbitt*, 654 F.2d at 333-34. In that case Shell Oil contracted with Diamond M. and Sladco to work on a drilling operation. *Id.* at 331. Corbitt, an employee of Sladco, sued Diamond M. in tort,

6

Diamond M. then sought indemnification from Shell pursuant to their contract. *Id.* Shell subsequently filed a third-party action seeking indemnification from Sladco pursuant to their contract, which provided that "[Sladco] shall indemnify and defend [Shell] . . . against all claims, suits, liabilities and expenses on account of injury or death of . . . employees of Shell or [Sladco] . . . arising out of or in connection with performance of this [contract]." *Id.* The Fifth Circuit held that Shell was not entitled to indemnification from its contractor, Sladco, because the indemnification provision in the Shell/Sladco contract restricted Sladco's duty to indemnify solely to tortious obligations. *Id.* at 333. The Fifth Circuit refused to read the phrase "all claims" to include contractual obligations because the Shell/Sladco contract did not specifically provide that Sladco assumed claims arising from Shell's own separate contractual obligations. *Id.*; *see also Foreman*, 770 F.2d at 497-98 (holding that a service contract that provides indemnity "against all claims, demands and causes of action ... for injury to or death or illness of persons" does not obligate a contractor to indemnify an oil company against a claim brought by a rig company because the indemnity provision, without naming the rig company as an indemnitee, merely includes tortious obligations).

In contrast, in *Mills v. Zapata Drilling Co.*, 722 F.2d 1170 (5th Cir. 1983), *overruled on other grounds*, the Fifth Circuit, when applying Louisiana law incorporated as federal law under OCSLA, held that express notice of third party contractual liabilities was given where the indemnity contract clearly included the third party as an indemnitee. *Mills*, 722 F.2d at 1174-75. In *Mills*, an employee of a contractor was killed in an accident occurred on a drilling platform due to negligent operation by Zapata, a subcontractor of the drilling company. *Id*. at 1171. The employee's wife sought recovery from Zapata, Zapata then sought indemnity from

7

the drilling company. *Id*. The drilling in turn demanded indemnity from the contractor. *Id*. at 1171-72. The agreement between the drilling company and the contractor provided that the contractor agreed to indemnify the drilling company and its *invitees* against "any and all claims, demands or suits . . . brought . . . by any employee of [the contractor] . . . in anywise arising out of or incident to the work to be performed under [the contract]." The Fifth Circuit reasoned that because the agreement specifically named the drilling company's invitees, including Zapata, as indemnitees, the indemnity language was clear enough to give the contractor notice of indemnity for contractual liability. *Id*. at 1174-75; *see also Campbell v. Sonat Offshore Drilling, Inc.*, 27 F.3d 185 (5th Cir. 1994).

      Likewise, the Fifth Circuit in *Sumrall v. Ensco Offshore Co.*, 291 F.3d 316 (5th Cir.2002), held that an indemnitor had notice of contractual liabilities where a contract provided indemnity "from and against all claims, losses, costs, demands, damages, suits, ... and causes of action of whatsoever nature or character ... and whether arising out of contract, tort, strict liability, . . . and/or any cause whatsoever." 291 F.3d at 318. There, Sumrall was an employee of Premiere, an offshore drilling service provider. *Id.* at 317. Sumrall sued Ensco, the owner of a jack-up vessel, to recover for injuries sustained while working on the vessel. *Id.* Santa Fe, a rig operator, assumed defense of claims pursuant to its contract with Ensco and then sought indemnification from Premiere. *Id.* at 317-18. The Fifth Circuit reasoned that, unlike the narrowly drawn language in *Corbitt*, indemnity provisions in the contract between Santa Fe and Premiere, contained rather expansive language broadening Santa Fe's right to indemnification for "all claims ... of whatsoever nature or character . . . whether or not caused by the . . . legal duty of [Santa Fe]." *Id.* at 320. The Fifth Circuit also held that, as in *Lirette*,

Premiere had express notice of indemnity obligation for third-party contractual liability because the contract clearly included Santa Fe's contractors and subcontractors as indemnitees. *Id*. at 320-22. Therefore, it held that Premiere could not escape its indemnity obligation by contending that that the contract mentioned personal injury. *Id*.

Moreover, in *Breaux v. Halliburton Energy Service*, 562 F.3d 358 (5th Cir. 2009), the Fifth Circuit held that a third-party indemnitee was entitled to indemnity for contractual obligations because the contract required indemnity "against any and all liability arising out of . . . all claims . . . for personal or bodily injury." 562 F.3d at 364-66. In *Breaux*, an employee of Halliburton Energy Service ("HES") was killed in a crash of a helicopter which transported him and other members between drilling platforms. *Id.* at 360-61. The plaintiff sued Era, the helicopter operator, and its parent company, Rowan. *Id*. Era and Rowan sought indemnification from HES pursuant to the Rowan/HES Agreement. *Id*. HES subsequently demanded indemnity from Era and Rowan according to the Era/Unocal Agreement, under which Era agreed to indemnify Unocal and its contractors "against any and all liability arising out of . . . all claims . . . resulting from [Era's] ownership, operation, maintenance or use of aircraft." *Id*. at 361-62. The Fifth Circuit determined that HES, although not a party to the Era/Unocal Agreement, was entitled to indemnity for its contractual obligation to Era because it was Nippon's contractor, a member of the class of named indemnitees, and the indemnity provision clearly gave notice to Era of such obligation. *Id*. at 366.

IOC's contention that the term "contractor" of Section 12 in the Nippon/IOC MSC is ambiguous is without merit. The introductory paragraphs of the Nippon/IOC MSC state that "[Nippon] is employed in numerous business activities, including, but not limited to, the

9

drilling of exploratory and development wells, seeking and producing oil, gas, and other minerals." Rec. Doc. 88, Exh. A. It should be noted that IOC and GOL were providing services to Nippon under MSCs with same language. Even adopting the definition of "contractor" promulgated by IOC,[4] the Court finds that GOL satisfies the definition. GOL provided services – chartering vessels for clients, obviously a piece of work of Nippon's overall oil exploration activities – to Nippon and was responsible for the outcome of its services. Also, GOL pursued its own business and was not in the control of Nippon. Therefore, the Court determines that IOC's argument that GOL is not a contractor of Nippon is meritless. As a result, GOL qualifies as a third-party beneficiary to the Nippon/IOC MSC.

By plain reading of the indemnity provisions in the Nippon/IOC MSC, the Court finds that GOL's contractual liability to Offshore Liftboats is encompassed in IOC's indemnity obligations. The language of Section 12 in the Nippon/IOC MSC is closely similar to those of the indemnity provisions in *Sumrall* and *Breaux*. As the indemnity provision in *Sumrall* which broadly included "all claims, losses, costs, demands, damages, suits . . ." within the indemnity obligation, here Section 12(c) defines "Claims" to include "claims, demands, . . . , liabilities . . . of any kind and nature . . . which in any way arise out of or are related to . . . [the Nippon/IOC MSC]." In addition, just as HES in *Breaux*, in which the Fifth Circuit found

---

[4] IOC supplies the definition by Black's Law Dictionary, 5th ed., which provides:
> A contractor is a person who, in the pursuit of any independent business, undertakes to do a specific piece of work for other persons, using his own means and methods without submitting himself to their control in respect to all its details, and who renders service in the course of an independent occupation representing the will of his employer only as to the result of his work and not as to the means by which it is accomplished.
>
> One who in pursuit of independent business undertakes to perform a job or piece of work, retaining in himself control of the means, methods and manner of accomplishing the desired result.

10

HES, a third-party beneficiary to the Era/Unocal Agreement, entitled to indemnity for its contractual liability, here GOL is contractually entitled to indemnity from IOC because the Nippon/IOC MSC names Nippon's contractors, including GOL, as indemnitees. Furthermore, as in *Breaux*, where the Fifth Circuit held that indemnity language providing a right of indemnity for "any and all liability arising out of . . . all claims . . . for personal and bodily injury" gave express notice of contractual liability, here the Nippon/IOC MSC clearly gives IOC notice of third-party contractual liability because Section 12 requires IOC to indemnify GOL "against any and all Claims . . . on account of any cause whatsoever." As a result, the contract entitles GOL to indemnity from IOC for its contractual liability to Offshore Liftboats.

2. **Nevertheless, The LOIA Invalidates The Indemnity Provisions At Bar Because the Provisions Provides A Right to Indemnity To An Indemnitee Who Might Be At Fault.**

The OCSLA, 43 U.S.C. § 1331, et seq., sets forth mandatory choice-of-law rules and federal regulation applying to various activities occurring beyond the territorial waters of the states on the Outer Continental Shelf. *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 495 (5th Cir.2002); *Union Tex. Petroleum Corp. v. PLT Eng'g, Inc.*, 865 F.2d 1043, 1050 (5th Cir.1990). Pursuant to the OCSLA, the law of the United States exclusively governs the Outer Continental Shelf. *Rodrigue v. Aetna Cas. & Surety Co.*, 395 U.S. 352, 356-57 (1969). However, because federal law might be insufficient to cope with some potential legal problems arising on the OCS, the OCSLA supplements gaps in federal law by incorporating the laws of the adjacent state. *Id.* Under incorporation, the law of the adjacent state is treated as "the law of the United States" but only to the extent that it is "applicable" and "not inconsistent with . . . other Federal laws." *Id.* (quoting 43 U.S.C. § 1333).

The Supreme Court and the Fifth Circuit have held that Section 1333(a)(1) creates a situs requirement for the application of the OCSLA. *Demette*, 280 F.3d at 496 (citing *Offshore Logistics, Inc. v. Tallentire*, 477 U.S. 207 (1986)). In *PLT*, the Fifth Circuit, construing Sections 1333(a)(1) and 1333(a)(2) together, articulated a three-part test to determine whether state law governs a controversy arising on the OCS: "(1) the controversy must arise on a situs covered by the OCSLA[;] (2) federal maritime law must not apply of its own force[; and] (3) the state law must not be inconsistent with federal law." *PLT*, 865 F.2d at 1043. Therefore, when determining whether adjacent state law is incorporated under the OSCLA, the threshold inquiry is whether the controversy arises on an OCSLA situs. *Demette*, 280 F.3d at 498.

> a. The accident occurred on an OCSLA situs because Ebanks had physical contacts with the offshore drilling platform.

The Fifth Circuit has explained in *Demette* that an OCSLA situs is one of the following locations:

> (1) the subsoil and seabed of the OCS; (2) any artificial island, installation, or other device if (a) it is permanently or temporarily attached to the seabed of the OCS, and (b) it has been erected on the seabed of the OCS, and (c) its presence on the OCS is to explore for, develop, or produce resources from the OCS; (3) any artificial island, installation, or other device if (a) it is permanently or temporarily attached to the seabed of the OCS, and (b) it is not a ship or vessel, and (c) its presence on the OCS is to transport resources from the OCS.

*Demette*, 280 F.3d at 497. Therefore, an offshore oil drilling platform that is temporarily or permanently attached to the seabed is considered an OCSLA situs. *Hollier v. Union Tex. Petroleum Corp.*, 972 F.2d 662, 664 (5th cir. 1992) (citing *Rodrigue*, 395 U.S. at 361-66). Also, the situs requirement is satisfied when an injury occurred on a liftboat that was temporarily jacked up and attached to the seabed of Outer Continental Shelf. *A.M.C. Liftboats, Inc. v. Apache Corp.*, 622 F. Supp. 2d 355, 359 (E.D. La. 2008) (Engelhardt, J.). Moreover, an

accident involving a plaintiff on a vessel who is nevertheless in physical contact with a platform may be deemed to have occurred on an OCSLA situs. *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1527 (5th Cir. 1996); *Hollier*, 972 F.2d at 664-656. In *Hollier*, the Fifth Circuit held that the situs requirement was satisfied where a platform worker was killed while stepping from a stationary crew boat to an offshore platform. *Hollier*, 972 F.2d at 664-656. Similarly, the Fifth Circuit in *Hodgen* held that an injury occurred on an OCSLA situs when a worker attempted a transfer from a platform to a vessel by swing rope that was attached to the platform. *Hodgen*, 87 F.3d 1527; *see also Champagne v. Tetra Applied Techs. Inc.*, 2006 WL 287985 (S.D. Tex. 2006) (holding that an accident occurred on an OCSLA situs because the plaintiff was transferred from a vessel to a platform by a personnel basket lifted by a crane on the platform); *Dennis v. Bud's Boat Rental, Inc.*, 987 F. Supp. 948 (E.D. La.1997) (McNamara, J.) (holding that the physical contact requirement was satisfied where the plaintiff was injured during a basket transfer when the personnel basket was lifted by a crane on a platform); *but cf. Naquin v. Lin-Bar Marine, Inc.*, 2009 WL 649895(E.D. La. 2009) (Zainey, J.) (determining that the physical contact requirement was not met because the plaintiff actually was injured when he was on board of a vessel rather than during a personnel basket transfer).

      In light of the precedent, the Court finds that the controversy at bar occurred on an OCSLA situs. The SMI 34I undisputedly is an OCSLA situs because it is permanently attached to the seabed. At the time of the accident, Ebanks was in physical contact with SMI 34I because: (1) his body was in the personnel basket which was connected to the crane by the crane cable; (2) the crane was permanently affixed to L/B JANIE; (3) L/B JANIE was jacked

up next to the SMI 34I; and (4) L/B JANIE was connected to SMI 34I by a walkway. Furthermore, Ebanks's case is different from *Naquin*, in which the plaintiff was injured when he stepped into a manhole on the deck of a vessel rather than during the transfer. Here, Ebanks was injured in the process of a basket transfer, and, while the accident occurred, his body was linked to the crane on L/B JANIE that was connected to SMI 34I by a walkway. Although the Court is aware that Ebanks avers that his body hit the stacks of the M/V BETTY CHERAMIE, this fact does not alter the Court's conclusion that at the time of the accident Ebanks had physical contact with the platform.

      b. *The LOIA is incorporated as federal law pursuant to the OCSLA because the Nippon/IOC MSC is a non-maritime contract.*

As for the second part of the *PLT* test, the Fifth Circuit has held that "deciding whether a contract is maritime and whether maritime law applies of its own force" are identical inquiries for purposes of determining OCSLA applicability in the context of oilfield indemnity disputes. *Hodgen*, 87 F.3d at 1524-25. Although characterizing a contract as maritime or non-maritime is "not altogether clear area of the law," courts will "look to the nature and subject-matter of the contract and ask whether it has reference to maritime service or maritime transactions." *Alleman v. Omni Serv. Energy Corp.*, 580 F.3d 280, 284 (5th Cir. 2009) (citing *New England Mut. Marine Ins. Co. v. Dunham*, 78 U.S. 1, 26-27 (1870) and *Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 611 (1991)) (original quotations omitted). Therefore, to determine whether a contract is a maritime one, courts "cannot look to whether a ship or other vessel was involved in the dispute," *Id.* (citing *Norfolk S. Ry. Co. v. Kirby*, 543 U.S. 14 (2004)). "Instead, the answer depends upon the nature and character of the contract,

and the true criterion is whether it has reference to maritime service or maritime transactions."

*Id*.

Determining whether a contract is maritime is a "highly fact-specific . . . inquiry," and thus a two-part inquiry is adopted in this circuit. *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313, 315-16 (5th Cir.1990). Courts will consider the historical treatment on a category of contracts and the following six factors: "1) what does the specific work order in effect at the time of the injury provide? 2) what work did the crew assigned under the work order actually do? 3) was the crew assigned to do work aboard a vessel in navigable waters[?] 4) to what extent did the work being done relate to the mission of the vessel? 5) what was the principal work of the injured worker? and 6) what work was the injured worker actually doing at the time of the injury?" *Id.* at 316.

Applying the *Davis* factors to the case at bar, the Court concludes that the principal obligation of the Nippon/IOC MSC was non-maritime. The Court finds that the first factor is in favor of IOC's argument because under the Nippon/IOC MSC, IOC mainly provided operating, managing and maintenance services on Nippon's fixed oil drilling platforms. Such activities generally are non-maritime. The second factor also is in IOC's favor because IOC's workers performed such services on the fixed platforms. With respect to the third factor, the Court finds it supports IOC's argument because Ebanks was assigned to work on SMI 23G and its satellite platforms rather than on vessels in navigable waters. The fourth factor favors GOL's argument because a vessel was involved in the transportation of the crew. As GOL argues, vessel transportation was necessary on the day of the accident because operating a helicopter under the surrounding circumstances was dangerous. Without a vessel transporting

15

Ebanks and the crew to the SMI 34-I, they would not be able to perform their work. However, the Court finds that the fifth and the sixth factor both support IOC's argument. Ebanks was a lead operator who was assigned to perform his work on the fixed platforms, and at the time of the injury he was about to be aboard the platform to do his job. Weighing the *Davis* factors in total, the Court concludes that the Nippon/IOC MSC is a non-maritime contract.

GOL's contention that the Nippon/IOC MSC is a maritime contract heavily relies on the argument that on the day of the accident a vessel was used for transporting Ebanks. GOL attempts to support such argument by providing the Court with a conclusory statement of law: "A contract for offshore drilling is maritime if it requires the use of a vessel."[5] Rec. Doc. 88. However, GOL's argument is contrary to the approach – to examine the nature of the contract rather than to look to whether a vessel is involved – mandated by the Supreme Court and the Fifth Circuit. *See Alleman*, 580 F.3d at 285 (citing *Norfolk*, 543 U.S. at 24). Accordingly, the Court determines that a single sporadic use of a vessel, such as the case here, to transport a plaintiff to an offshore drilling platform does not materially transform an otherwise non-maritime contract into a maritime one.[6] *See Champagne*, 2006 WL 287985 at *5-*6 (holding

---

[5] GOL cites *Demette*, 280 F.3d at 500-01. However, the essence of the rule stated in *Demette* is that a court will not consider a contract for offshore drilling non-maritime *simply because* no vessel is mentioned in the contract. *See Demette*, 280 F.3d at 500-01. In *Demette*, after examining similar contracts and weighing the *Davis* factors, the Fifth Circuit determined that a contract for casing work on a drilling rig was a maritime contract. *Id.* The Fifth Circuit in *Demette* did not, as GOL argues here, simply consider whether a vessel was used.

[6] In cases where offshore contracts were determined to be maritime, the use of vessel was not only required but also critical to the purpose of the contracts. *See Lewis v. Glendel Drilling Co.*, 898 F.2d 1083 (5th Cir.1990) (holding that a drilling service contract was maritime because the use of an offshore drilling rig was "obviously necessary"); *Alex v. Wild Well Control, Inc*., 2009 WL 2599782 (E.D. La. 2009) (holding that a contract to provide rigging personnel and services aboard a vessel in connection with the salvaging of a submerged oil platform was maritime because a vessel was necessary for performing such service). In contrast, in cases where vessels were merely incidental to the purpose of the disputed contracts, courts found such contracts were non-maritime. *See eg. Falcon Operators, Inc. v. P.M.P. Wireline Serv., Inc.*, 1997 WL 610825 (E.D. La. 1997) (determining that federal maritime law did not apply to a contract to provide wireline service on offshore rigs because, among others, wireline services were only incidentally related to the vessels' mission – to transport employees from one site to another.).

that a contract to perform services on an offshore fixed drilling platform was non-maritime because the main obligation under the contract was to operate the devices on the platform, which was not a traditional maritime activity); *Dennis*, 987 F. Supp. at 951 (holding that federal maritime law did not apply to an injury occurred during a personnel basket transfer from a vessel to a fixed platform because the plaintiff's work – installing and repairing communication equipment – was not inherently maritime).

Finally, as for the last part of the *PLT* test, which asks whether the provisions of state law are inconsistent with any provision of federal law, the Fifth Circuit has specifically held that "nothing in the LOIA is inconsistent with federal law." *Hodgen*, 87 F.3d at 1529. Therefore, pursuant to OCSLA, LOIA is incorporated as the law of the United State and governs the controversy at bar.

> c. *LOIA invalidates the indemnity provision at issue, and the* Meloy *exception does not apply.*

The Louisiana Oilfield Anti-Indemnity Act ("LOIA") provides in relevant part as follows:

> Any provision contained in, collateral to, or affecting an agreement pertaining to a well for oil, gas, or water, or drilling for minerals which occur in a solid, liquid, gaseous, or other state, is void and unenforceable to the extent that it purports to or does provide for defense or indemnity, or either, to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons, which is caused by or results from the sole or concurrent negligence or fault (strict liability) of the indemnitee, or an agent, employee, or an independent contractor who is directly responsible to the indemnitee.

La. Rev. Stat. Ann. § 9:2780(B) (2005). The Act arose out of a concern about the unequal bargaining power of oil companies and contractors. *Fontenot v. Chevron U.S.A., Inc.*, 676 So. 2d 557, 563 (La. 1996). As the Supreme Court of Louisiana has explained, the purpose of the

LOIA is "to protect certain contractors, namely those in oilfields, from being forced through indemnity provisions to bear the risk of their principals' negligence." *Id.* Thus, the LOIA establishes "an exception to general Louisiana contract law that allows a principal to be indemnified against his own negligence so long as that intent is clearly expressed." *Id.* Accordingly, the LOIA nullifies *any* indemnity provision providing indemnity for liabilities arising out of personal injuries caused by *any* negligence or fault on the part of the indemnitee. *Meloy v. Conoco, Inc.*, 504 So. 2d 833, 838 (La. 1987). However, in *Meloy*, the Supreme Court of Louisiana held that after trial on the merits an indemnitee who was not at fault may recover cost of defense from the indemnitor. *Id.* at 839. The *Meloy* exception does not apply unless the indemnitee and its agent, employee, and independent contractor who is directly responsible to the indemnitee, are found faultless after trial. La. Rev. Stat. Ann. § 9:2780(A) (2005); *Home Ins. Co. v. Garber Indus., Inc.*, 588 F.Supp. 1218, 1223 (W.D. La. 1984).

      Here, the indemnity provision of the Nippon/IOC MSC is invalidated pursuant to the LOIA. Section 12(d) in the Nippon/IOC MSC provides for a right to "defense and indemnity against claims of personal or bodily injury . . . on account of . . . the sole, joint and/or concurrent negligence, fault or strict liability of any member of [Nippon's] Group." Rec. Doc. 88, Exh. A. Such provision obviously is prohibited by the LOIA because it attempts to provide a right of indemnity to an indemnitee even though it might be at fault. In addition, the Court concludes that GOL is not entitled to reimbursement under the *Meloy* exception because the *Meloy* exception only allows recovery for the cost of defense after GOL is found faultless by the factfinder.

Accordingly,

IT IS ORDERED that the motion for summary judgment filed by Island Operating Company, Inc. (Rec. Doc. 86) is GRANTED.

New Orleans, Louisiana, this 10th day of November, 2009.

                                              HELEN G. BERRIGAN
                                              UNITED STATE DISTRICT COURT